GRUBER ELROD JOHANSEN HAIL SHANK, LLP
David W. Elrod (TX SBN: 06591900)
delrod@getrial.com
Samuel M. Stricklin (TX SBN: 19397050)
sstricklin@getrial.com
Tricia R. DeLeon (TX SBN: 24005885)
tdeleon@getrial.com
J. Machir Stull (TX SBN: 24070697)
mstull@getrial.com
Hayley Ellison (TX SBN: 24074175)
hellison@getrial.com
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: 214.855.6800
Facsimile: 214.855.6808

*Co-Counsel for Official Committee
of Unsecured Creditors*

GIBSON, DUNN & CRUTCHER LLP
Samuel A. Newman (*admitted pro hac vice*)
snewman@gibsondunn.com
Olivia Adendorff (TX SBN: 24069994)
oadendorff@gibsondunn.com
Michael S. Neumeister (*admitted pro hac vice*)
mneumeister@gibsondunn.com
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

EMMERT & PARVIN, LLP
D. Wade Emmert (TX SBN: 00793688)
wade@emmertparvin.com
1701 N. Market Street, Suite 404
Dallas, Texas 75202
Telephone: 469.607.4500
Facsimile: 469.607.4501

## IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| TPP ACQUISITION, INC. d/b/a The Picture People, | § | |
| Debtor. | § | |
| _____ | § | |
| | § | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TPP ACQUISITION, INC. | § | Case No. 16-33437-hdh-11 |
| | § | Chapter 11 |
| Plaintiff, | § | |
| v. | § | Adv. Proc. No. 16-_____-hdh-11 |
| | § | |
| MONROE CAPITAL MANAGEMENT ADVISORS LLC; MONROE CAPITAL PARTNERS FUND LP; MONROE CAPITAL CORPORATION; MONROE CAPITAL PARTNERS FUND LLC; TPP HOLDINGS, LLC; TPP OPERATING, INC. | § | |
| Defendants. | § | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TPP
ACQUISITION, INC.'S COMPLAINT FOR (I) DECLARATORY RELIEF;
(II) EQUITABLE SUBORDINATION; (III) RECHARACTERIZATION;
(IV) AVOIDANCE OF PREFERENCES; (V) AVOIDANCE OF FRAUDULENT
TRANSFERS; (VI) TORTIOUS INTERFERENCE; (VII) BREACH OF FIDUCIARY
DUTY; (VIII) AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES;
(IX) INSTRUMENTALITY/CONTROL LIABILITY; (X) PRINCIPAL/AGENT
LIABILITY; (XI) REIMBURSEMENT AND INDEMNIFICATION; (XII) ALTER
EGO; AND (XIII) DISALLOWANCE OF CERTAIN CLAIMS**

The Official Committee of Unsecured Creditors of TPP Acquisition, Inc. (the "Committee" or "Plaintiff"), appointed in the above-captioned chapter 11 case of TPP Acquisition, Inc. d/b/a The Picture People (the "Debtor" or the "Company"), by and through its undersigned counsel, hereby files, on behalf of the unsecured creditors of the Debtor and on behalf of the Debtor's estate, this *Complaint for (I) Declaratory Relief; (II) Equitable Subordination; (III) Recharacterization; (IV) Avoidance of Preferences; (V) Avoidance of Fraudulent Transfers; (VI) Tortious Interference; (VII) Breach of Fiduciary Duty; (VIII) Aiding and Abetting Breaches of Fiduciary Duties; (IX) Instrumentality/Control Liability; (X) Principal/Agent Liability; (XI) Reimbursement and Indemnification; (XII) Alter Ego; and (XIII) Disallowance of Certain Claims* (the "Complaint") against Monroe Capital Management Advisors LLC ("Monroe Advisors"), Monroe Capital Partners Fund LP ("Monroe CP"), Monroe Capital Corporation ("Monroe CC", and, together with Monroe Advisors and Monroe CP, the "Monroe Lender Defendants"), Monroe Capital Partners Fund LLC ("Monroe General Partner", and, together with the Monroe Lender Defendants, the "Monroe Defendants"), TPP Holdings, LLC ("TPP Holdings"), and TPP Operating, Inc. ("Purchaser", and, together with the Monroe Lender Defendants and TPP Holdings, the "Defendants").  The Committee is continuing to investigate the facts underlying this Complaint and the

relationship and transactions between the Debtor and the Defendants, and expressly reserves the right to amend or supplement the parties to, and claims for relief in, the Complaint, and to assert and file any cross-claims and/or third-party complaints herein and in any related adversary proceeding. In support of the requested relief, the Committee alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a case about how the Debtor's prepetition secured lenders—the Monroe Lender Defendants—orchestrated control over all facets of the Debtor's capital structure and business operations in order to enrich themselves, and acquire the valuable assets of the Debtor over the legitimate rights and expectations of, and to the detriment of, the Debtor and its unsecured creditors. Through various methods, including forcing the Debtor's prior owners to assign 100% of the Debtor's stock to their affiliate, the Monroe Lender Defendants exerted substantial control over the Debtor, and have forced the Debtor to take actions detrimental to the Debtor and all of its unsecured creditors for the sole benefit of the Monroe Lender Defendants. This misconduct was pervasive and relentless prior to the Petition Date (as defined below), and culminated with the results of the Debtor's bankruptcy case. On November 8, 2016, an affiliate of the Monroe Lender Defendants closed on purchasing substantially all of the Debtor's assets free and clear of approximately $19 million to $21 million in unsecured claims, leaving only unliquidated litigation claims (including those asserted in this Complaint) for the Debtor's creditors to realize any recovery.

2.      The Monroe Lender Defendants have been secured lenders of the Debtor since December 2012 when they made an initial approximately $17 million advance to the

Debtor for the sole purpose of facilitating the Debtor's dividend recapitalization that provided a dividend to equity of approximately $18.9 million and paid off insider debt of approximately $2 million. At that time, the Debtor was owned by TPP Acquisition Holdings, LLC (the "Blackstreet Owner"), an affiliate of Blackstreet Capital Management LLC. The Debtor received no value from the Monroe Lender Defendants' advances and was insolvent at the time of or rendered insolvent by these transactions. Accordingly, the Monroe Lender Defendants' initial purported secured claim against the Debtor should be avoided as a constructive fraudulent transfer.

3. Further, in late 2014, the Monroe Lender Defendants used asserted covenant defaults under their credit agreement with the Debtor to force the Blackstreet Owner to assign to them 100% of the equity in the Debtor. The Monroe Lender Defendants assigned their right to receive the equity in the Debtor to TPP Holdings, an admitted "affiliate" of the Monroe Lender Defendants. After the Monroe Lender Defendants, through TPP Holdings, acquired the equity in the Debtor, the Monroe Lender Defendants continued to contribute approximately $20.9 million in capital to the Debtor, at a time when the Debtor was insolvent and no third-party lender would make such a loan. Such funds should be recharacterized as equity investments, rather than indebtedness owed by the Debtor.

4. Further, since acquiring the equity in the Debtor, the Monroe Lender Defendants assumed the reins over all facets of the Debtor's operations for the sole purpose of maximizing their interest in the Debtor's assets. The Monroe Lender Defendants' actions as lender, shareholder, and control person resulted in substantial harm to the Debtor and its other creditors and resulted in no less than $19 million to $21 million in unsecured claims being accrued as of the Petition Date.

5.     The Monroe Lender Defendants swiftly replaced the Debtor's board of directors with their own selections, and also terminated the Debtor's CEO, John Johnson, and hired the Debtor's new CEO, Ian Gomar, without involving the Debtor's board of directors.  Mr. Gomar has consistently represented and admitted his loyalty to the Monroe Lender Defendants beyond his role with the Debtor, and has been the means through which the Monroe Lender Defendants have been able to manipulate the Debtor's business to siphon value for themselves at the expense of the Debtor's unsecured creditors.

6.     The Monroe Lender Defendants are liable to the Debtor's estate under a number of causes of action.  Most fundamentally, the Bid Procedures Order and Sale Order (each as defined below) both make clear that the Monroe Lender Defendants and Purchaser were only permitted to credit bid the agreed $12 million purchase price under the Stalking Horse Agreement (as defined below) to the extent the Monroe Lender Defendants have a $12 million allowed secured claim secured by the Purchased Assets.  Pursuant to Bankruptcy Code section 552(a), the Purchased Assets include substantial property and value that is not subject to the Monroe Lender Defendants' liens, and therefore may not be acquired through a credit bid.  As a result, under the express terms of the Sale Order, the Debtor's estate has a *prima facie* right to payment from Purchaser, Monroe CP, Monroe CC, and Monroe General Partner for the value of the Purchased Assets that is not encumbered by the Monroe Lender Defendants' liens.  The only question is what that value is.

7.     As explained in detail below, the amount of the Monroe Lender Defendants' secured claim that may be credit bid against the purchase price is less than $12 million.  First, substantially all of the Monroe Lender Defendants' asserted claims are subject to fraudulent transfer, recharacterization, and equitable subordination claims, as described

above.  Second, the Debtor's business is comprised of both the Monroe Lender Defendants' collateral and non-collateral assets-including unencumbered leases and property created or acquired post-petition.  Pursuant to the Sale Order, Monroe can only credit bid for the value of its collateral and must pay cash for the rest.

8.      Further, the Monroe Lender Defendants have taken advantage of their dual lender/shareholder role in a manner far beyond what is typical in an arms'-length creditor-lender relationship.  The Monroe Lender Defendants have exercised control over all facets of the Debtor's business, causing the Debtor and its estate substantial harm.  In fact, the Monroe Lender Defendants' control was so pervasive that they should be deemed the alter ego of the Debtor, resulting in the Monroe Lender Defendants being liable for all claims asserted against the Debtor, currently estimated at approximately $19 million to $21 million.

9.      The Defendants have harmed this estate both prepetition and postpetition. Through this Complaint, Plaintiff seeks the recovery of damages for the Defendants' misconduct, and further seeks relief ensuring that the Defendants are not permitted to abscond with substantially all of the estate's assets without paying the cash amounts required under the Court's prior orders.

<u>**JURISDICTION AND VENUE**</u>

10.      On September 2, 2016 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>").  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (c).  This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b).  Plaintiff consents to the entry of final orders or judgment by this Court.

13.     Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the district court's reference of proceedings to the bankruptcy court, this Court may exercise subject matter jurisdiction over this adversary proceeding.  Venue in this district is proper in accordance with 28 U.S.C. §§ 1408 and 1409(a).

14.     This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## STANDING

15.     The Court granted the Committee standing to assert the claims and causes of action in this Complaint under that *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtor and Debtor in Possession to Obtain Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [D.I. 230] (the "Final DIP Order") entered on October 7, 2016.

## THE PARTIES

16.     The Committee, as Plaintiff in this adversary proceeding, on behalf of the Debtor's estate and its unsecured creditors, was appointed on September 13, 2016, pursuant to section 1102 of the Bankruptcy Code.[1]  Pursuant to section 1103 of the Bankruptcy Code,

---

[1] The Committee consists of (i) W. B. Mason Company, Inc.; (ii) Identity Management Consultants, LLC; (iii) AAA Imaging Solutions; (iv) Noritsu America Corporation; (v) Urban Retail Properties, LLC; (vi) GGP Limited Partnership; (vii) MFA Contemporary Atelier, Inc. d/b/a Gemline Frame Company; (viii) DFM Print Pak; and (ix) Simon Property Group, Inc.

the Committee has investigated and continues to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtor.

17. Upon information and belief, Monroe Capital Management Advisors LLC is a Delaware limited liability company, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

18. Upon information and belief, Monroe Capital Partners Fund LP is a Delaware limited partnership, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

19. Upon information and belief, Monroe Capital Corporation is a Maryland corporation, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

20. Upon information and belief, Monroe Capital Partners Fund LLC is a Delaware limited liability company, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

21. Upon information and belief, TPP Holdings, LLC is a Delaware limited liability company, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

22. Upon information and belief, TPP Operating, Inc. is a Delaware corporation, headquartered at 311 South Wacker Drive, Suite 6400, Chicago, IL 60606.

## FACTUAL ALLEGATIONS

23. The Monroe Lender Defendants are providers of senior and junior debt and equity co-investments to middle market companies in the United States and Canada.

**(a) The Debtor's Business.**

24. Prior to the closing of the Asset Sale (as defined below), the Debtor purported to be the premier operator of professional photographic portrait studies on in-studio family

portraits, children's portraits, and special occasion photography.   The Debtor operated

primarily under the name "The Picture People" in its mall-based and Buy Buy Baby, Inc.

locations, "Sears Portrait Studios" in its Sears locations, and "Portraits in Minutes" in its

Wal-Mart locations.   In addition to providing photography services, the Debtor provided

on-location photo processing and printing, framing and other related services.   As of the

Petition Date, the Debtor operated 147 photo studios in 30 states.

25.     In connection with the Debtor's business, the Debtor relies on a number of

trade vendors to supply the Debtor with the goods and services necessary for operations.

Such trade vendors provide the Debtor with, among other things, custom and non-custom

frames, film, camera equipment, on-location photo processing equipment and printing

supplies, marketing materials, packaging materials, props, bulk inventory supplies, product

packaging supplies, pre-installment fixtures, IT equipment, and other goods and materials

(collectively, the "Merchandise").

26.     The Debtor's trade creditors and vendors historically provided the Debtor

with goods and services on credit.

27.     These trade creditors and vendors relied on the Debtor's representations that

they were owned by, or had the financial backing of, the Monroe Lender Defendants to

cover the Debtor's operating expenses.

**(b)     The Debtor's Prior Ownership.**

28.     On information and belief, at some point in 2010 or 2011, Blackstreet Capital

Management LLC or an affiliate thereof (collectively, "Blackstreet") purchased debt owed

by the business's prior owner ("Prior Owner"), and secured by substantially all of the assets

of the Prior Owner, for approximately $10,000,000.

29.     In March 2011, Blackstreet foreclosed on the Prior Owner's assets through a

UCC Article 9 foreclosure and public sale.  On information and belief, Blackstreet acquired

the Prior Owner's assets at a public auction for a credit bid of approximately $7,000,000.

Blackstreet formed the Debtor to acquire the Prior Owner's assets and portrait studio

business.

30.     On information and belief, the portrait studio business acquired by the Debtor

continued to suffer significant losses after it was acquired by Blackstreet.  By the end of

2011, the Debtor decreased its studio count from 175 locations to approximately 102

locations.

### (c)     Monroe's Initial Investment in and Acquisition of the Debtor.

31.     In 2011, the Debtor experienced a temporary boost in revenue growth when it

began a partnership with Groupon, Inc. ("Groupon").  Groupon is an online "deal of the

day" provider that, in exchange for a fee, enters into agreements with service providers,

such as the Debtor, to sell "vouchers" to online customers for use of the service-providers'

goods or services at a steep discount.  Although the Debtor was selling its services through

the Groupon program at a steep discount, the Debtor experienced increased revenue due to

an increase in the amount of customers purchasing the Debtor's goods and services.

32.     Blackstreet seized on this momentary increase in revenue generated from

Groupon sales andorchestrated a scheme to extract millions of dollars in value from the

Debtor, while overleveraging the Debtor's balance sheets and granting liens to the Monroe

Lender Defendants on substantially all of the Debtor's assets.[2]

---

[2] As described below, the Monroe Lender Defendants do not have liens on all of the Debtor's assets or value.

33.     On information and belief, the Debtor entered into that certain Credit Agreement dated as of December 17, 2012 (as amended, supplemented or otherwise modified, the "Prepetition Credit Agreement") as borrower, with Monroe Advisors as the Administrative Agent and Lead Arranger, and Monroe CP and Monroe CC as the lenders. Monroe General Partner is the general partner of Monroe CP.

34.     Under the Prepetition Credit Agreement, the Monroe Lender Defendants assert that they have advanced $17,090,000 (the "2012 Monroe Loan") to the Debtor for the sole purposes of the Debtor paying approximately $2,015,111.11 in indebtedness allegedly owing to BCP II Picture People, LLC, on information and belief an affiliate of Blackstreet, and to make an $18,923,254.89 dividend to Blackstreet Owner, the prior equity owner of the Debtor and, on information and belief, an affiliate of Blackstreet.

35.     The net effect of the 2012 Monroe Loan was that (i) the Debtor incurred approximately $17,090,000 in obligations owing to the Monroe Lender Defendants; (ii) substantially all of the Debtor's assets became encumbered by liens securing the Debtor's obligations to the Monroe Lender Defendants pursuant to the "Collateral Documents" (as defined in the Prepetition Credit Agreement); and (iii) the Debtor made a cash dividend to Blackstreet Owner of $18,923,254.89 and paid insider debt, which may have been subject to recharacterization or avoidance, to an affiliate of Blackstreet totaling $2,015,111.11. The Debtor did not receive any value from this transaction.

36.     In addition, at least two of the Debtor's current officers or advisors received direct payments out of the dividend to Blackstreet Owner. John Johnson, the former CEO and director of the Debtor, and currently a paid consultant to the Debtor, received $378,457.79. Keith Spencer, the Debtor's CFO, received $189,274.55. Further, on

information and belief, the remaining directors of the Debtor were employed by or affiliated with Blackstreet, and received direct or indirect financial benefit from the dividend to Blackstreet Owner.

37.    The transactions contemplated under the Prepetition Credit Agreement were not approved by any independent or disinterested officers or directors of the Debtor, and the transactions were not adequately investigated or analyzed to consider their benefit to the Debtor.  On information and belief, the Monroe Lender Defendants at all times knew that the Debtor's officers and directors were not disinterested, and that the Debtor had not performed an adequate analysis of the transaction to consider the benefit to the Debtor. This transaction did not provide a benefit to the Debtor.

38.    The Debtor was insolvent at the time of, or as a result of, the Prepetition Credit Agreement and the transactions completed thereby, including, but not limited to, the dividend to the Blackstreet Owner.  The Debtor's audited balance sheet for the year ending December 29, 2012 showed that the Debtor had total liabilities of $30,298,647 and total assets of only $14,739,519.  On information and belief, the Debtor's total assets may have actually been worth less at this point given that only twenty (20) months prior to the date of this balance sheet, Blackstreet, an independent third-party buyer, acquired the Debtor's assets for only a $7,000,000 credit bid.

39.    Further, the substantially undercapitalized Debtor, shortly after closing the transactions under the Prepetition Credit Agreement, was unable to pay its debts as they came due.

40.    The Debtor faced a looming default under the Prepetition Credit Agreement shortly after the closing of the 2012 Monroe Loan.  The Prepetition Credit Agreement

provided for several financial covenants beginning March 30, 2013 that if not satisfied would constitute defaults under the Prepetition Credit Agreement. *See* Prepetition Credit Agreement, §§ 11.14, 13.1.5.

41.     On information and belief, the Debtor did not meet its projected revenue and other metrics of financial performance immediately after the closing of the 2012 Monroe Loan and was in default under the Prepetition Credit Agreement due to the Debtor's failure to satisfy necessary financial covenants no later than March 30, 2013—less than three (3) months after the closing of the 2012 Monroe Loan.

42.     The Debtor was also rendered undercapitalized by the 2012 Monroe Loan.

43.     Burdened with massive debt and obligated to make millions of dollars of loan payments as well as other fees and costs to Blackstreet, the Debtor had insufficient capital to operate its planned business and make needed investments.   The Debtor continued its steady decline.

44.     The Debtor and Monroe executed five (5) amendments to the Prepetition Credit Agreement through 2013 and 2014 keeping the Debtor in a constant state of default or near default.

45.     About the end of 2014, the Monroe Lender Defendants asserted certain defaults against the Debtor under the Prepetition Credit Agreement.   Based on the default under the Prepetition Credit Agreement and, on information and belief, the Blackstreet Owner's belief that there was no equity value in the Debtor, Blackstreet Owner agreed to assign 100% of the stock of the Debtor to TPP Holdings, as designee of the Monroe Lender Defendants.

46.     This stock transfer was completed pursuant to a letter agreement and separate

Stock Transfer Agreement, each dated as of December 19, 2014 (collectively, the "Stock

Transfer Agreement").  As a result of this assignment, the Monroe Lender Defendants have

remained lenders of the Debtor under the Prepetition Credit Agreement, and, through their

affiliate and designee, TPP Holdings, beneficial owners of 100% of the equity in the Debtor.

47.     No later than the time of their acquisition of ownership of the Debtor, the

Monroe Lender Defendants began planning to take ownership of the Debtor's assets free

and clear of unwanted obligations through a Chapter 11 case.  Notwithstanding this clear

intention, the Monroe Lender Defendants continued to incur and to cause the Debtor to

incur obligations to third parties knowing these third parties relied on the Monroe Lender

Defendants' support of the Debtor. The Monroe Lender Defendants had no intention of

satisfying, or allowing the Debtor to satisfy, obligations to these third parties.

### (d)     The Monroe Lender Defendants Exercised Pervasive and Unrelenting Control over the Debtor for Their Exclusive Benefit.

48.     As soon as the Monroe Lender Defendants acquired the equity of the Debtor

through TPP Holdings, the Monroe Lender Defendants immediately exercised pervasive

and unrelenting control of all facets of the Debtor's operations for the sole purpose of

maximizing their recovery without regard and to the detriment of the Debtor's other

creditors.

### (i)     The Monroe Lender Defendants Controlled the Debtor's Board of Directors.

49.     As part of the Stock Transfer Agreement, the Monroe Lender Defendants

immediately removed two (2) of the Debtor's three (3) then-acting directors, Murry Gunty

and Brooks Kraft, from the Debtor's board of directors.

50.    The Monroe Lender Defendants then implanted their own directors, John Kolleng and Paul Traub, to replace them.

51.    On information and belief, no formal stockholder or board-member decision was taken to implement or ratify these changes.  This was in violation of the Debtor's bylaws (as amended, supplemented or otherwise modified, the "Bylaws"), which required the Debtor's directors to be selected by the Debtor's stockholder(s) by formal meeting or a signed writing.

52.    The Monroe Lender Defendants then replaced the Debtor's remaining board-member, John Johnson, with Ian Gomar.  As explained below, Ian Gomar was appointed by the Monroe Lender Defendants as an officer of the Debtor by the Monroe Lender Defendants solely to further the Monroe Lender Defendants' agenda in siphoning value from the Debtor for their own benefit and to the detriment of the Debtor's other creditors.

53.    On information and belief, the Monroe Lender Defendants failed to observe corporate formalities in their dealings with the Debtor.

54.    The Monroe Lender Defendants controlled whether and when the Debtor's board of directors would hold meetings.  As a result and at the Monroe Lender Defendants' direction, from approximately November 17, 2015 through July 5, 2016, the Debtor's board of directors held no meetings.  During this time, as explained below, the Monroe Lender Defendants, among other things, (i) caused the Debtor to enter into material agreements governing the opening of "store-within-a-store" studios, thereby implementing a complete shift in the Debtor's business plan; (ii) caused the Debtor to enter into approximately two (2) new mall leases and opened twelve (12) store-within-a-store studios; (iii) implanted Ian Gomar as CEO of the Debtor; (iv) provided for the firing of the Debtor's previous CEO,

John Johnson; (v) caused the Debtor to enter into two (2) amendments to the Prepetition Credit Agreement and Collateral Documents; (vi) caused the Debtor to enter into lease renegotiations with landlords to benefit from rent forbearances and other concessions only for such renegotiations to terminate prior to the Petition Date; (vii) caused the Debtor to continue to order increased goods while the Debtor and the Monroe Lender Defendants knew that the Debtor would not have sufficient funds to pay for those orders; and (viii) began planning the Debtor's bankruptcy filing and the eventual sale of the Debtor's assets to themselves. These were all material actions that should have been subject to decisions of the Debtor's board of directors or at least brought to the board's attention in a regular, formal meeting.

55.   Further, high-ranking representatives of the Monroe Lender Defendants routinely attended and participated in those board meetings that the Debtor did hold. Such representatives included (i) Zia Uddin, Managing Director, Portfolio Manager, and Head of Special Situations for Monroe Capital; (ii) Mike Egan, Executive Vice President and Chief Operating Officer for Monroe Capital; and (iii) Nathan Harrell, Director for Monroe Capital.

56.   For example, Mr. Uddin was responsible for exploring a potential sale process for the Debtor and/or its assets, and updating the board on his progress. Although Mr. Uddin and the Monroe Lender Defendants received offers for the purchase of the Debtor and/or its assets, Mr. Uddin and/or the Monroe Lender Defendants unilaterally determined not to pursue such actions without any regard for the best interests of the Debtor or its other creditors. Mr. Uddin, on behalf of the Monroe Lender Defendants, also controlled any negotiations with potential strategic partnerships with the Debtor, and made decisions over

whether such strategic partnerships, including Wal-Mart, would be pursued, notwithstanding any contrary recommendations by the Debtor's officers. And when it came time to negotiate credit terms for additional infusions of capital, representatives of the Monroe Lender Defendants would dictate to the board of directors what those terms would be, with no vetting of the fairness of these terms by the Debtor's board of directors.

> **(ii)** **The Monroe Lender Defendants Controlled the Selection and Compensation of the Debtor's Officers, In Violation of the Debtor's Bylaws.**

57.     The Debtor's Bylaws provide that the selection, removal, and compensation of the Debtor's officers is to be the duty and obligation of the Debtor's board of directors. In knowing violation of the Debtor's Bylaws, the Monroe Lender Defendants overtook all of these duties and obligations in order to further entrench their control at all levels of leadership within the Debtor.

58.     In April 2015, the Monroe Lender Defendants selected Ian Gomar to lead their charge in supplanting the then-current regime with the Debtor. The Monroe Lender Defendants directed the Debtor to retain Mr. Gomar initially as consultant. However, the Monroe Lender Defendants, through their control of the Debtor, immediately elevated Mr. Gomar to a position of authority over the then-current CEO, John Johnson. During this time, the Monroe Lender Defendants continuously discussed with Mr. Gomar the plan and timing for the termination of Mr. Johnson. Further, the Monroe Lender Defendants had weekly calls with Mr. Gomar separate and apart from the periodic calls that the Monroe Lender Defendants would have with the Debtor's management team, which also included Mr. Gomar. At the direction of the Monroe Lender Defendants, Mr. Gomar and the

Debtor fired Mr. Johnson as CEO, without any consideration or decision from the Debtor's board of directors.

59.    Mr. Gomar consistently confirmed that his loyalty was to the Monroe Lender Defendants, not just the Debtor.   In fact, in negotiating his compensation as CEO of the Debtor with the Monroe Lender Defendants, Mr. Gomar declared to Zia Uddin that one of his priorities in fulfilling his role with the Debtor was "to continue working with [Monroe] as a turnaround specialist . . . beyond what happens to [the Debtor]."

60.    When Mr. Johnson was fired as CEO, the Monroe Lender Defendants selected Mr. Gomar as CEO.   After the fact, the Debtor's board of directors ratified this selection at a board meeting on July 5, 2016.

61.    Further, the Monroe Lender Defendants orchestrated and were in charge of the search for a replacement of the Debtor's current CFO, Keith Spencer.   Representatives for the Monroe Lender Defendants were the first to meet with all candidates, and in fact drafted and negotiated offers and potential engagement agreements.   The Debtor's CRO retained in connection with the bankruptcy was also retained by the Debtor at the recommendation and direction of the Monroe Lender Defendants.

62.    The Monroe Lender Defendants also controlled officer compensation.   This is most explicit in an email from Nathan Harrell, on behalf of the Monroe Lender Defendants, when he exclaimed to Mr. Gomar that "[a]ll future bonuses and raises are at Monroe's discretion."   This was not an isolated statement, as Mr. Harrell further negotiated directly with John Johnson and Keith Spencer their respective compensation and bonus amounts. Mr. Gomar further negotiated his salary as CEO with the Monroe Lender Defendants, not the Debtor's board of directors.   This is in blatant violation and disregard of the Debtor's

Bylaws, which provide that "[t]he salaries of all officers will be fixed by the Board of Directors, and may be changed from times [sic] to time by the Board of Directors."  On information and belief, the Debtor's officers and board of directors acquiesced to these actions without taking any steps to assess whether the actions were in the best interests of the Debtor.

### (iii) The Monroe Lender Defendants Exercised Strict Decision-Making Control Over the Debtor's Operations and Payments to Creditors.

63.     The Monroe Lender Defendants exerted substantial control over the Debtor's day-to-day operations, in addition to selecting and controlling the Debtor's board of directors and officers.  This control over the Debtor was largely implemented through the Monroe Lender Defendants' self-selected CEO, Ian Gomar.

64.     On information and belief, Mr. Gomar and Nathan Harrell (of Monroe Capital) held weekly private calls and/or meetings to discuss the Debtor's business plan, performance, the amount of the Debtor's existing and/or projected payables, and the payment of creditors.

65.     In addition to these meetings with Mr. Gomar, the Monroe Lender Defendants held weekly calls and/or meetings with the Debtor's officers, which included Mr. Gomar.

66.     Prior to these meetings between the Monroe Lender Defendants and the Debtor's officers, the Debtor would provide financial reports to the Monroe Lender Defendants providing, among other things, lists of vendor and other payments the Debtor sought approval to pay.

67.     Under the Monroe Lender Defendants' control, the Debtor was not permitted to make payments to vendors or other creditors without the Monroe Lender Defendants' approval.   This is not consistent with the restrictions or covenants provided in the Prepetition Credit Agreement, and beyond what is customary in arms'-length debtor-lender relationships.

68.     The Monroe Lender Defendants also directed and controlled the Debtor's renegotiation of leases prior to the Petition Date.   Nathan Harrell, Zia Uddin, and Mike Egan, all representatives of the Monroe Lender Defendants, engaged and/or participated in the process of renegotiating leases between the Debtor and third-party landlords.   During these lease renegotiations, third-party landlords forbore from exercising their remedies due to past due rent or made other concessions.   Prior to the Petition Date, at the direction of the Monroe Lender Defendants, the Debtor terminated discussions with its landlords, and the Debtor was left with approximately $5,400,000 in unpaid rent as of the Petition Date.

69.     Examples of the Monroe Lender Defendants' substantial control over the Debtor's trade and landlord payables are provided below:

a)     Zia Uddin, based on discussions with Mike Egan, recommended to Ian Gomar on April 11 and 12, 2016 how to structure lease renegotiations with General Growth, including such that payments by the Debtor for past-due rent be "back end loaded," on information and belief, based on the knowledge that a bankruptcy filing would or could occur in September 2016.

b)     Nathan Harrell engaged in email communications with the Debtor's officers and representatives on April 11 and 21, 2016, where he provided substantive direction regarding the Debtor's cash flow models.

c)     Nathan Harrell, on April 13, May 9, and June 10, 2016, directly corresponded with RCS Real Estate Advisors, the Debtor's advisor in its lease renegotiations, regarding negotiations with the Debtor's landlords.

d)   Ian Gomar, on March 7 and 23, 2016, made specific requests for payments of vendors, which were reviewed and approved by Nathan Harrell.

e)   Ian Gomar, on March 22 and 23, 2016, asked Nathan Harrell for his "[t]houghts" on whether a specific landlord for a store in Houston, Texas should be paid and whether settlements should be reached with certain of the Debtor's largest landlords.

**(iv)   The Monroe Lender Defendants' Control Over the Debtor Was for Their Sole Benefit and Harmed the Debtor and Its Creditors.**

70.     The Monroe Lender Defendants exercised control over the Debtor for the sole purpose of enriching themselves to the detriment of the Debtor and its other creditors, and acted beyond the terms of the Prepetition Credit Agreement and applicable law in doing so.

71.     The Monroe Lender Defendants began considering bankruptcy options for the Debtor at least as early as December 2014.  Notwithstanding this fact, the Debtor, under the control of the Monroe Lender Defendants, consistently began increasing the amount of its Merchandise inventory on a studio-by-studio basis.

72.     For example, in June 2015, the Debtor maintained only approximately $9,198 in inventory on average at each studio.  Adjusting for the opening and closing of stores, this results in approximately $1,812,095 in Merchandise inventory among all studio locations. These figures increased by approximately 81% in June 2016 to $16,655 in inventory on average at each studio, and $3,281,012 in inventory among all studio locations.   This increase in inventory occurred at the Debtor's warehouse(s) as well, as the adjusted inventory value increased from June 2015 to June 2016 by approximately 134%, from $209,266 to $489,209.

73.     This increase in the Debtor's inventory corresponded with an increase in the amount of the Debtor's accounts payable each month.   This means that while the Debtor was increasing the amount of its Merchandise orders, the Debtor was falling further behind in payments to vendors.   For example, the adjusted total accounts payable in August from 2012 to 2015 averaged approximately $2,051,272.   However, the adjusted total account payment in August 2016, immediately prior to the Petition Date, was $3,798,860.   This is an 85.2% difference.

74.     Similarly, while the Monroe Lender Defendants were controlling the Debtor's lease renegotiations with the Debtor's landlords, the Debtor was continuing to fall behind on rent while the Monroe Lender Defendants attempted to extract concessions from the landlords.   As of the Petition Date, the Debtor's landlords were owed approximately $5,400,000 in unpaid rent.

75.     Furthermore, following the Monroe Lender Defendants' taking control of the Debtor in December 2014, the Debtor incurred approximately $19 million to $21 million in unsecured claims and payables, which were unpaid as of the Petition Date.   These claims were incurred while the Debtor was insolvent, the Monroe Lender Defendants were actively planning for the Debtor's bankruptcy, and representations were being made to creditors that the Monroe Lender Defendants were supporting the Debtor's obligations.

76.     When the Debtor, through its officers and directors and under the control of the Monroe Lender Defendants, incurred indebtedness as a result of making orders for Merchandise or accruing unpaid debt obligations, the Debtor had no clear means of paying for such indebtedness.   At such time, the Debtor had negative cash flow, and had no source to pay accrued debt without the Monroe Lender Defendants making additional infusions of

capital.  The Monroe Lender Defendants were only making additional infusions of capital

on a case-by-case basis, and with no firm commitment to the Debtor.

77.    As a result of the Monroe Lender Defendants' control of the Debtor, the

Debtor and its unsecured creditors were damaged.   The Monroe Lender Defendants

intentionally and recklessly caused such harm as part of their plan to acquire the Debtor's

assets, free and clear of unsecured claims, through the Debtor's bankruptcy filing.   By

increasing the amount of the Debtor's payables owing to trade vendors and landlords, the

Monroe Lender Defendants limited the amount of funds they would have to advance to the

Debtor to keep the Debtor operational.   Further, by increasing the Debtor's inventory and

not paying for it, the Monroe Lender Defendants, as the eventual purchaser of the Debtor's

assets, including its inventory, acquired such assets without having to make any payment to

the trade vendors that supplied such inventory.   This plan was accomplished through the

Monroe Lender Defendants with the acquiescence or assistance of the Debtor's officers and

directors, most of whom were selected by the Monroe Lender Defendants.

### (e)    The Debtor's Bankruptcy Case and Monroe's Obligation to Pay Cash for the Assets They Have Acquired.

78.    On the Petition Date, the Debtor filed a voluntary petition under chapter 11

of the Bankruptcy Code.   Further, on the Petition Date, the Debtor filed the *Debtor's*

*Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362,*

*363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtor and Debtor in*

*Possession to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting*

*Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V)*

*Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*

(the "DIP Motion").   Pursuant to the DIP Motion, the Debtor sought interim and final

approval of that *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* dated as of September 2, 2016 (as amended, supplemented or otherwise modified, the "DIP Agreement"), by and between the Debtor as borrower, and the Monroe Lender Defendants either as Administrative Agent, Lead Arranger, and/or Lenders.   Pursuant to the DIP Motion and the DIP Agreement, Monroe agreed to lend what was eventually increased to $48.3 million to the Debtor; provided, however, that at least $41.2 million of that amount was to be used to convert prepetition obligations owing under the Prepetition Credit Agreement into postpetition obligations with superpriority over other creditors and secured by additional collateral, including the Debtor's lease proceeds (the "Roll-Up").

79.    The Court entered an order approving the DIP Motion on an interim basis on September 7, 2016.  On October 7, 2016, the Court entered the Final DIP Order.  Under the Final DIP Order, the Court approved the Roll-Up, but preserved all rights to unwind the Roll-Up for any reason, including as a result of the Court determining that any of the liens granted to the Monroe Lender Defendants under the Final DIP Order covered unencumbered assets as of the Petition Date.  Final DIP Order, ¶ 6; Hr'g Tr. 9/29/16, p. 41:15–42:11.

80.    On the Petition Date, the Debtor also filed the *Debtor's Expedited Motion, Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006, for Entry of an Order (A) Approving Sale and Bidding Procedures and Bid Protections in Connection with Sale of Assets of the Debtor, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* (the "Bid Procedures Motion").  Pursuant to the Bid Procedures Motion, the Debtor sought approval of, among other things, (i) that *Asset Purchase Agreement* dated as of September 2, 2016 (as

amended, supplemented or otherwise modified, the "Stalking Horse Agreement"), by and

between the Debtor as seller and TPP Holdings as stalking horse purchaser, and (ii) certain

bid procedures for an auction of the Debtor's assets.   The Stalking Horse Agreement was

later amended or modified such that Monroe CC and Monroe CP became the joint stalking

horse purchaser.    After entry of the Sale Order, the rights under the Stalking Horse

Agreement were assigned to Purchaser.

81.    On October 11, 2016, the Court entered the *Order Approving Sale and Bidding*

*Procedures and Bid Protections in Connection With Sale of Assets of the Debtor and Granting Related*

*Relief* [D.I. 239] (the "Bid Procedures Order").   Pursuant to the Bid Procedures Order, the

Court authorized the Debtor to enter into the Stalking Horse Agreement subject to Court-

approved bid procedures for overbids and a potential auction process.   The Bid Procedures

Order also determined the Monroe Lender Defendants' and Purchaser's right to credit bid

for the Debtor's assets to be sold under the Stalking Horse Agreement (as defined in the

Stalking Horse Agreement, the "Purchased Assets").   The Bid Procedures Order provides:

> In connection with the bidding and sale process authorized herein, the
> DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders,
> respectively, may in their discretion seek to credit bid some or all of
> its/their respective claims for its/their respective collateral (each a
> "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code;
> provided, that notwithstanding anything in Section 2.7(e) of the DIP
> Credit Agreement to the contrary, any such Credit Bid(s) shall not
> exceed $25,000,000 in the aggregate. A Credit Bid may be applied only
> to reduce the cash consideration with respect to those assets in which
> the party submitting such Credit Bid holds a security interest.

Bid Procedures Order, ¶ 31 (emphasis added).   As a result of this provision, the Monroe

Lender Defendants and Purchaser are only permitted to credit bid an amount equal to the

allowed secured claim of the Monroe Lender Defendants.   The Stalking Horse Agreement

was amended to provide that Purchaser's credit bid would be $12,000,000.   Stalking Horse

Agreement, § 2.1(a)(ii).   In the event Purchaser or the Monroe Lender Defendants are determined to not have a right to credit bid $12,000,000, the difference between the allowed credit bid right and $12,000,000 would have to be paid in cash to the Debtor's estate.

82.   The deadline under the Bid Procedures Order for the submission of third-party overbids passed on October 21, 2016, and the Debtor received no Qualified Bids (as defined under the Bid Procedures Order).   As a result, the Debtor sought Court approval of the sale of the Purchased Assets to Purchaser under the Stalking Horse Agreement.   The Court approved the sale pursuant to the *Order Granting the Debtor's Motion, Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006, For Entry of an Order Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and Granting Related Relief* [D.I. 355] (the "Sale Order").

83.   The Sale Order provides:

> If this Court or any court of competent jurisdiction, determines that Purchaser does not have a valid right to credit bid the full amount of the Purchase Price pursuant to section 363(k) of the Bankruptcy Code, whether as a result of Purchaser not having a sufficient secured claim or otherwise, Purchaser shall pay in cash to the Debtor's estate the difference between the Purchase Price and the amount of the secured claim such Court determines that Purchaser has a right to credit bid for the Purchased Assets.

Sale Order, ¶ L.   Purchaser's obligation to make payments to the Debtor under the Sale Order are the joint and several obligation of Purchaser, Monroe CP, and Monroe CC.   *Id.* at ¶ 61.

84.   The sale of the Debtor's Purchased Assets to Purchaser (the "Asset Sale") closed on November 8, 2016.   As a result of the sale, the Monroe Lender Defendants have successfully siphoned all of the value from the Debtor's estate for their sole and exclusive benefit, leaving only unliquidated litigation claims to satisfy unsecured creditors anticipated

not less than $19,000,000 – $21,000,000.  The Defendants and their respective professionals and advisors knew and intended for this to be the result of this bankruptcy case, and did not anticipate any competitive bid process.  As a result of the approval of the Sale Order, the Defendants have furthered their objective since the Monroe Lender Defendants acquired the equity in the Debtor—exercise complete control of the Debtor and its operations to maximize the recovery for the Monroe Lender Defendants without regard for and to the detriment of the Debtor's other creditors.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Declaratory Relief for Plaintiff – Payment of Amounts Owing Under the Sale Order (Against Purchaser, Monroe CP, and Monroe CC)**

85.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 84 as if fully set forth herein.

86.     Under the Sale Order, Purchaser acquired the Purchased Assets in exchange for a credit bid, pursuant to Bankruptcy Code section 363(k), in an amount of $12,000,000.

87.     Under applicable law and the Bid Procedures Order, Purchaser was only entitled to credit bid for the Purchased Assets to the extent Purchaser or the Monroe Lender Defendants have valid credit bid rights under Bankruptcy Code section 363(k) equal to or greater than $12,000,000, and may only credit bid on the Purchased Assets to the extent they are subject to valid liens and secured claims of the Monroe Lender Defendants.

88.     The Monroe Lender Defendants do not have valid and perfected liens against all of the Purchased Assets.

89.     The amount of the Monroe Lender Defendants' allowed secured claim and permitted credit bid is reduced on grounds of equitable subordination, recharacterization, and fraudulent transfer.

90.     Under the Sale Order, Purchaser, Monroe CP, and Monroe CC are obligated to pay to the Debtor and its estate, in cash, an amount equal to the difference between $12,000,000 and the amount the Court determines Purchaser had a valid right to credit bid pursuant to Bankruptcy Code section 363(k), "whether as a result of Purchaser not having a sufficient secured claim or otherwise." Sale Order, ¶¶ L, 61.

91.     Notwithstanding the above, Purchaser and the Monroe Lender Defendants have taken the position that Purchaser had a valid right to credit bid the full $12,000,0000 purchase price for the Purchased Assets.

92.     For all the reasons set forth above, Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Purchaser, Monroe CP, and Monroe CC are obligated to pay to the Debtor and its estate an amount in cash equal to the difference between $12,000,000 and the allowed amount of the Monroe Lender Defendants' allowed secured claim secured by the Purchased Assets.

### Second Claim for Relief

### Breach of Contract – Payment of Amounts Owing Under the Sale Order (Against Purchaser, Monroe CP, and Monroe CC)

93.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 92 as if fully set forth herein.

94.     The Stalking Horse Agreement and the Sale Order constitute a binding, valid, and enforceable contract or agreement.

95.     The Debtor has complied with any and all provisions under the Stalking Horse Agreement and Sale Order regarding the sale and transfer of the Purchased Assets to Purchaser.

96.     As set forth above, Purchaser, Monroe CP, and Monroe CC agreed to pay to the Debtor and its estate, in cash, an amount equal to the difference between $12,000,000 and the amount the Court determines Purchaser had a valid right to credit bid pursuant to Bankruptcy Code section 363(k), "whether as a result of Purchaser not having a sufficient secured claim or otherwise." Sale Order, ¶¶ L, 61.

97.     The Purchaser has not established the amount of its valid right to credit bid, and as described above, that amount is in all events less than $12,000,000.

98.     For all the reasons set forth above, Plaintiff is entitled to money judgment that Purchaser, Monroe CP, and Monroe CC, jointly and severally, are obligated to pay to the Debtor and its estate an amount in cash equal to the difference between $12,000,000 and the amount of the Monroe Lender Defendants' allowed secured claim secured by the Purchased Assets.

### Third Claim for Relief

**Equitable Subordination Pursuant to Bankruptcy Code Section 510(c) (Against Monroe Lender Defendants)**

99.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 98 as if fully set forth herein.

100.     The equities in this case demand that the amounts allegedly owed to the Monroe Lender Defendants on account of the Prepetition Credit Agreement, including any amounts purportedly "rolled up" under the Final DIP Order, should be subordinated to all other claims except those of equity interest holders under Bankruptcy Code section 510(c).

101.    The Monroe Lender Defendants, on their own behalf and through TPP

Holdings, have, in violation of and without regard for the Debtor's corporate form, the

Debtor's Bylaws, and other organizational controls, exercised substantial control over the

Debtor's decision-making process and governance, and were prior to the Petition Date and

still are insiders of the Debtor.  The Monroe Lender Defendants' substantial control over the

Debtor is evidenced by, among other things, (i) the Monroe Lender Defendants causing the

replacement of the Debtor's board of directors with persons loyal to the Monroe Lender

Defendants, (ii) the Monroe Lender Defendants attending and participating in all meetings

for the Debtor's board of directors, (iii) the Monroe Lender Defendants causing the

replacement of the Debtor's prior CEO, John Johnson, with Ian Gomar, who has admitted

his loyalty to the Monroe Lender Defendants, (iv) the Monroe Lender Defendants directly

negotiating employment terms for the Debtor's executive officers, (v) the Monroe Lender

Defendants deciding which vendors and landlords would be paid, and (vi) causing the

Debtor to continue to order Merchandise on credit and to benefit from rent forbearances

while the Monroe Lender Defendants limited the funding available to repay such unsecured

debt and while the Monroe Lender Defendants were analyzing a potential chapter 11

bankruptcy filing for the Debtor.

102.    TPP Holdings, for the benefit of or at the direction of the Monroe Lender

Defendants, breached its fiduciary duties of good faith, honest governance, loyalty and care

to the Debtor and its creditors by, among other wrongs, engaging in self-dealing transactions

for the sole benefit of itself and its affiliates, the Monroe Lender Defendants, to the

detriment of the Debtor and its creditors.  At all times, TPP Holdings was under the control

of the Monroe Lender Defendants.

103.    The Monroe Lender Defendants' inequitable conduct, including through its affiliate, TPP Holdings, injured the Debtor and its creditors by, among other things, causing the Debtor to (i) order Merchandise from trade vendors in amounts more than the Debtor's ordinary needs for the respective time of year, outside of the period during which any such creditor might assert administrative expense claims or reclamation rights under Bankruptcy Code sections 503(b)(9) or 546(c), respectively, and then causing the Debtor to not pay certain of the Debtor's trade vendors, thereby increasing the Debtor's outstanding trade payables as of the Petition Date, (ii) obtain forbearances under its real property leases while the Debtor engaged in lease renegotiations that the Debtor never intended to complete and terminated prior to the Petition Date, and (iii) commence the Debtor's bankruptcy case and enter into the Stalking Horse Agreement and the DIP Agreement for the purpose of selling substantially all of the Debtor's assets to the Monroe Lender Defendants or an affiliate thereof free and clear of all unsecured claims.  Further, the Monroe Lender Defendants have inequitably caused the Debtor to stipulate to the amount of its debt with no real investigation of potential defenses thereto, thereby inflating the amount of the Debtor's secured claim and enabling the Monroe Lender Defendants to assert a credit bid far in excess of any potential third-party bid.

104.    Equitable subordination of the Monroe Lender Defendants' purported debt holdings to all other claims except those of equity interest holders is consistent with the provisions of the Bankruptcy Code.  Monroe should not be permitted to profit from an illicit scheme that it willingly, and intentionally, wrought upon the Debtor and its creditors, in violation of its affiliate's, TPP Holdings, fiduciary duties of good faith and loyalty.

105.    For the reasons set forth above, the Monroe Lender Defendants' claims under the Prepetition Credit Agreement, in total, against the Debtor should be subordinated to all other claims asserted against the Debtor pursuant to section 510(c) of the Bankruptcy Code because the Monroe Lender Defendants' inequitable conduct resulted in injury to the Debtor's creditors as a whole and conferred an unfair advantage on the Monroe Lender Defendants and its affiliates, TPP Holdings and Purchaser, and such subordination would be consistent with the provisions of the Bankruptcy Code.

106.    Pursuant to section 510(c)(2), any lien securing the Monroe Lender Defendants' claims that are subordinated should be transferred to the Debtor's estate.

## Fourth Claim for Relief

**Recharacterization Pursuant to 11 U.S.C. § 105(a) of the Monroe Lender Defendants' Purported Debt Holdings Under the Prepetition Credit Agreement (Against All Monroe Lender Defendants)**

107.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 106 as if fully set forth herein.

108.    On or about December 19, 2014, TPP Holdings, as the designee of the Monroe Lender Defendants, acquired 100% of the equity in the Debtor.

109.    Since the Monroe Lender Defendants' acquisition of the Debtor through TPP Holdings, the Monroe Lender Defendants have advanced $20,910,000 to the Debtor (together with related interest and fees, the "Post-Equity Advances").  The Debtor and the Monroe Lender Defendants have booked the Post-Equity Advances as loans under the Prepetition Credit Agreement.  The substance and character of the Post-Equity Advances is one of an equity contribution.

110.    Considering the totality of the circumstances surrounding the Monroe Lender Defendants' scheme to take control of the equity and assets of the Debtor, the Post-Equity

Advances should be recharacterized as equity interests based on, but not limited to, the following factors:

a)   The Monroe Lender Defendants, through their designee and affiliate, TPP Holdings, own 100% of the equity in the Debtor, and replaced the Debtor's board of directors;

b)   Financial statements included in marketing materials that were prepared by or for the Debtor did not include the Monroe Lender Defendants' asserted indebtedness;

c)   The Monroe Lender Defendants have used their position, either as lenders or as equity-holders of the Debtor, to exercise undue influence and control over the Debtor's governance and decision-making, beyond what is ordinarily expected of a lender;

d)   Despite pending defaults under the Prepetition Credit Agreement, the Monroe Lender Defendants never sought to enforce their rights against the Debtor's assets and the Monroe Lender Defendants' purported collateral;

e)   Since the Monroe Lender Defendants, through TPP Holdings, acquired the equity in the Debtor, the Monroe Lender Defendants have invested $20,910,000 into the Debtor despite outstanding defaults under the Prepetition Credit Agreement;

f)   The Post-Equity Advances were made at a time when the Debtor was substantially undercapitalized and where no third-party lender would have loaned funds to the Debtor given the Debtor's financial condition; and

g)   The Debtor did not always respect formal requirements under the Prepetition Credit Agreement, as it did not timely make certain interest payments.

111.   For the reasons set forth above, the Monroe Lender Defendants' claims against the Debtor arising out of the Post-Equity Advances should be recharacterized as equity pursuant to section 105(a) of the Bankruptcy Code.

**Fifth Claim for Relief**

**Avoidance of Preferences Under Bankruptcy Code Section 547(b) (Against All Monroe Lender Defendants)**

112.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 111 as if fully set forth herein.

113.    The Monroe Lender Defendants are "insiders" (as defined under Bankruptcy Code section 101(31)) of the Debtor.

114.    Within one (1) year prior to the Petition Date, the Debtor (i) entered into that Deposit Account Control Agreement, dated as of September 25, 2015 (as amended, the "2015 DACA"), (ii) made payments to the Monroe Lender Defendants as set forth in Exhibit A attached hereto (the "One Year Insider Payments"), and (iii) made certain amendments or modifications to the Prepetition Credit Agreement that, among other things, provided releases to the Monroe Lender Defendants, and transferred interests of the Debtor in property (collectively, the "One Year Credit Agreement Amendments"), each for the benefit of the Monroe Lender Defendants.

115.    The 2015 DACA, One Year Insider Payments and One Year Credit Agreement Amendments were each transfers made by the Debtor of interests of the Debtor in property to or for the benefit of the Monroe Lender Defendants.

116.    The 2015 DACA, One Year Insider Payments and One Year Credit Agreement Amendments were made for, or on account of, an antecedent debt (within the scope of Bankruptcy Code section 547(b)) owed by the Debtor to the Monroe Lender Defendants.

117.   The 2015 DACA, One Year Insider Payments and One Year Credit Agreement Amendments were made or entered into while the Debtor was insolvent or was presumed insolvent pursuant to Bankruptcy Code section 547(f).

118.   The 2015 DACA, One Year Insider Payments and One Year Credit Agreement Amendments enabled the Monroe Lender Defendants to receive a larger share of the Debtor's estate than if such transfers had not been made and if the Monroe Lender Defendants had received payment of such debt in a liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.

119.   The safe harbor provisions of section 546(e) of the Bankruptcy Code do not apply to the 2015 DACA, One Year Insider Payments or One Year Credit Agreement Amendments.

120.   For the reasons set forth above, the 2015 DACA, One Year Insider Payments and One Year Credit Agreement Amendments should be avoided as preferences under section 547(b) of the Bankruptcy Code.

<u>Sixth Claim for Relief</u>

**Avoidance of Liens Under Bankruptcy Code Section 544(a)(1) (Against All Monroe Lender Defendants)**

121.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 120 as if fully set forth herein.

122.   Pursuant to Bankruptcy Code section 544(a)(1), the Debtor has the rights and powers of a hypothetical judgment lien creditor.

123.   As of the Petition Date, the Monroe Lender Defendants had not perfected liens on the following assets or property owned by the Debtor (collectively, the "<u>Unencumbered Assets</u>"):

a.   Any commercial tort claims of the Debtor.

b.   Any of the Debtor's real property leases, including, but not limited to, any of the Debtor's agreements with Buy Buy Baby, Inc., SHC Licensed Business LLC, Wal-Mart Stores East, LP, Sam's East, Inc., Wal-Mart Stores, Inc., Sam's West, Inc., Wal-Mart Louisiana, LLC, Wal-Mart Stores Texas, LLC, Wal-Mart Stores Arkansas, LLC, Wal-Mart Puerto Rico, Inc., and any of their respective successors, assigns, or affiliates.

c.   Any cash or cash equivalents not included in a deposit account subject to a valid and enforceable control agreement, including, but not limited to, any cash, as of the Petition Date, held or located in:

  i.   Any of the Debtor's store locations; and

  ii.   The following accounts located at Fifth Third Bank:   (A) 7027049415;  (B)  7027049431;  (C)  7027049449;  and  (D) 7027049456.

d.   Any of the Debtor's property, including but not limited to any goodwill or other intangible value to the extent created or increased by efforts or actions taken by the Debtor after the Petition Date, that constitutes property acquired by the estate or by the Debtor after the Petition Date pursuant to Bankruptcy Code section 552(a).

e.   Any rights or interests of the Debtor arising as a result of the filing of the Debtor's bankruptcy case, including but not limited to any avoidance and preference actions under Chapter 5 of the Bankruptcy Code and any rights and powers under Bankruptcy Code section 365.

124.   As a hypothetical judgment lien creditor, the Debtor has liens against the Unencumbered Assets, or assets that become unencumbered due to avoidance or transfers as alleged herein, that are senior to any lien or interest asserted by the Monroe Lender Defendants, and any lien or interest asserted by the Monroe Lender Defendants in or against the Unencumbered Assets should be avoided.

125.   For the reasons set forth above, any lien or interest asserted by the Monroe Lender Defendants against the Unencumbered Assets should be avoided pursuant to Bankruptcy Code section 544(a)(1).

## Seventh Claim for Relief

**Avoidance of Payments and Other Transfers Made to the Monroe Lender Defendants Within One (1) Year of the Petition Date Under Bankruptcy Code Section 544(b)(1) and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

126.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 125 as if fully set forth herein.

127.    Pursuant to Bankruptcy Code section 544(b)(1), the Debtor has the rights of an existing unsecured creditor of the Debtor.  Section 544(b) permits the Debtor to assert claims and causes of action that such creditor could assert under applicable state law.

128.    The Monroe Lender Defendants are "insiders" (as defined under applicable state law) of the Debtor.

129.    Within one (1) year prior to the Petition Date, the Debtor made the One Year Insider Payments to the Monroe Lender Defendants.

130.    At the time of the One Year Insider Payments, one or more creditors had claims against the Debtor, whom also have allowed claims against the Debtor as of the Petition Date.

131.    At the time of the One Year Insider Payments, (i) the sum of the Debtor's debts was greater than all of the Debtor's assets at a fair valuation, and/or (ii) the Debtor was generally not paying its debts as they became due.

132.    At the time of the One Year Insider Payments, the Monroe Lender Defendants had reasonable cause to believe that (i) the sum of the Debtor's debts was greater than all of the Debtor's assets at a fair valuation, and/or (ii) the Debtor was generally not paying its debts as they became due.

133.   The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to the One Year Insider Payments.

134.   The One Year Insider Payments are avoidable under Bankruptcy Code section 544 and applicable state law.

135.   For the reasons set forth above, the Monroe Lender Defendants are liable to the Debtor and its estate for the return of the One Year Insider Payments, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtor's estate.

## **Eighth Claim for Relief**

**Avoidance of All Obligations Related to Prepetition Credit Agreement as Constructively Fraudulent Transfer Under Bankruptcy Code Section 544(b)(1) and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

136.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 135 as if fully set forth herein.

137.   Pursuant to Bankruptcy Code section 554(b)(1), the Debtor has the rights of an existing unsecured creditor of the Debtor.   Section 544(b) permits the Debtor to assert claims and causes of action that such a creditor could assert under applicable state law.

138.   Prior to the Petition Date, the Debtor entered into the Prepetition Credit Agreement, and borrowed the 2012 Monroe Loan pursuant thereto.

139.   Entry into the Prepetition Credit Agreement and the borrowing of the 2012 Monroe Loan was an obligation incurred by the Debtor to or for the benefit of the Monroe Lender Defendants.

140.    At the time of the Prepetition Credit Agreement and the 2012 Monroe Loan, one or more creditors had claims against the Debtor, whom also have allowed claims against the Debtor as of the Petition Date.

141.    The Debtor did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for its entry into the Prepetition Credit Agreement or the borrowing of the 2012 Monroe Loan.

142.    When the Debtor entered into the Prepetition Credit Agreement and borrowed the 2012 Monroe Loan, (i) the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, (ii) the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due, and/or (iii) at the time of the Prepetition Credit Agreement or 2012 Monroe Loan, (a) the sum of the Debtor's assets was greater than all of the Debtor's assets at a fair valuation, and/or (b) the Debtor was generally not paying its debts as they became due.

143.    The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to the One Year Insider Payments.

144.    The obligations and other transfers incurred in connection with the Prepetition Credit Agreement and 2012 Monroe Loan are avoidable under Bankruptcy Code section 544 and applicable state law.

145.    For the reasons set forth above, obligations and other transfers incurred in connection with the Prepetition Credit Agreement and 2012 Monroe Loan should be avoided pursuant to Bankruptcy Code section 544 and applicable state law.

### Ninth Claim for Relief

**Avoidance of Liens Securing 2012 Monroe Loan and Other Transfers Relating to the Prepetition Credit Agreement as Constructively Fraudulent Transfer Under Bankruptcy Code Section 544(b)(1) and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

146.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 145 as if fully set forth herein.

147.    Pursuant to Bankruptcy Code section 554(b)(1), the Debtor has the rights of an existing unsecured creditor of the Debtor.  Section 544(b) permits the Debtor to assert claims and causes of action that such a creditor could assert under applicable state law.

148.    Prior to the Petition Date, the Debtor entered into the Prepetition Credit Agreement, and borrowed the 2012 Monroe Loan pursuant thereto.  Further, prior to the Petition Date, the Debtor entered into the Collateral Documents and granted the Monroe Lender Defendants liens in certain of the Debtor's property (the "2012 Monroe Liens").

149.    The granting of the 2012 Monroe Liens was a transfer made by the Debtor to or for the benefit of the Monroe Lender Defendants.

150.    At the time of the 2012 Monroe Liens, one or more creditors had claims against the Debtor, whom also have allowed claims against the Debtor as of the Petition Date.

151.    The Debtor did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for the transfer of the 2012 Monroe Liens.

152.    When the Debtor transferred the 2012 Monroe Liens, (i) the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, (ii) the Debtor intended to incur, or believed or reasonably should have believed that the Debtor

would incur, debts beyond the Debtor's ability to pay as they became due, and/or (iii) at the

time of the 2012 Monroe Liens, (a) the sum of the Debtor's assets was greater than all of the

Debtor's assets at a fair valuation, and/or (b) the Debtor was generally not paying its debts

as they became due.

153.   The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to

the 2012 Monroe Liens.

154.   The 2012 Monroe Liens are avoidable under Bankruptcy Code section 544

and applicable state law.

155.   For the reasons set forth above, the 2012 Monroe Liens should be avoided

pursuant to Bankruptcy Code section 544 and applicable state law.

**Tenth Claim for Relief**

**Avoidance of Payments on Account of 2012 Monroe Loan as Constructively Fraudulent
Transfers Under Bankruptcy Code Section 544(b)(1) and Applicable State Fraudulent
Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

156.   Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 155 as if fully set forth herein.

157.   Pursuant to Bankruptcy Code section 554(b)(1), the Debtor has the rights of

an existing unsecured creditor of the Debtor.   Section 544(b) permits the Debtor to assert

claims and causes of action that such a creditor could assert under applicable state law.

158.   Prior to the Petition Date, the Debtor entered into the Prepetition Credit

Agreement, and borrowed the 2012 Monroe Loan pursuant thereto.   Further, prior to the

Petition Date, the Debtor transferred cash or other property to the Monroe Lender

Defendants on account of the 2012 Monroe Loan (the "2012 Monroe Loan Payments").

The 2012 Monroe Loan is avoidable under Bankruptcy Code section 544 and applicable state law.

159.    The 2012 Monroe Loan Payments were transfers made by the Debtor to or for the benefit of the Monroe Lender Defendants.

160.    At the time of the 2012 Monroe Loan Payments, one or more creditors had claims against the Debtor, whom also have allowed claims against the Debtor as of the Petition Date.

161.    The Debtor did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for the transfer of the 2012 Monroe Loan Payments.

162.    When the Debtor transferred the 2012 Monroe Loan Payments, (i) the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, (ii) the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due, and/or (iii) at the time of the 2012 Monroe Loan Payments, (a) the sum of the Debtor's assets was greater than all of the Debtor's assets at a fair valuation, and/or (b) the Debtor was generally not paying its debts as they became due.

163.    The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to the 2012 Monroe Loan Payments.

164.    The 2012 Monroe Loan Payments are avoidable under Bankruptcy Code section 544 and applicable state law.

165.    For the reasons set forth above, the Monroe Lender Defendants are liable to the Debtor and its estate for the return of the 2012 Monroe Loan Payments, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtor's estate.

### Eleventh Claim for Relief

**Avoidance of Payments and Transfers to the Monroe Lender Defendants as Constructively Fraudulent Transfers Under Bankruptcy Code Section 544(b)(1) and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

166.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 165 as if fully set forth herein.

167.    Pursuant to Bankruptcy Code section 554(b)(1), the Debtor has the rights of an existing unsecured creditor of the Debtor.  Section 544(b) permits the Debtor to assert claims and causes of action that such a creditor could assert under applicable state law.

168.    Prior to the Petition Date, the Debtor entered into the Prepetition Credit Agreement.  For the reasons set forth above, certain obligations under the Prepetition Credit Agreement should be recharacterized, disallowed, or avoided.

169.    Further, within the four (4) years prior to the Petition Date, the Debtor (i) transferred cash or other property to the Monroe Lender Defendants on account of the Prepetition Credit Agreement, and (ii) made certain amendments or modifications to the Prepetition Agreement that, among other things, provided releases to the Monroe Lender Defendants, and transferred interests of the Debtor in property (collectively, the "Four Year Monroe Transfers").  The Four Year Monroe Transfers are avoidable under Bankruptcy Code section 544 and applicable state law.

170.    The Four Year Monroe Transfers were transfers made by the Debtor to or for the benefit of the Monroe Lender Defendants.

171.    At the time of the Four Year Monroe Transfers, one or more creditors had claims against the Debtor, whom also have allowed claims against the Debtor as of the Petition Date.

172.    The Debtor did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for the transfer of the Four Year Monroe Transfers.

173.    When the Debtor transferred the Four Year Monroe Transfers, (i) the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, (ii) the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due, and/or (iii) at the time of the Four Year Monroe Transfers, (a) the sum of the Debtor's assets was greater than all of the Debtor's assets at a fair valuation, and/or (b) the Debtor was generally not paying its debts as they became due.

174.    The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to the Four Year Monroe Transfers.

175.    The Four Year Monroe Transfers are avoidable under Bankruptcy Code section 544 and applicable state law.

176.    For the reasons set forth above, the Monroe Lender Defendants are liable to the Debtor and its estate for the return of the Four Year Monroe Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and

conveyances, plus interest from the transfer dates, and costs and fees to the extent available

for the benefit of the Debtor's estate.

### Twelfth Claim for Relief

**Avoidance of Payments and Transfers to the Monroe Lender Defendants as
Constructively Fraudulent Transfers Under Bankruptcy Code Section 548 (Against All
Monroe Lender Defendants)**

177.   Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 176 as if fully set forth herein.

178.   Prior to the Petition Date, the Debtor entered into the Prepetition Credit

Agreement.  For the reasons set forth above, certain obligations under the Prepetition Credit

Agreement should be recharacterized, disallowed, or avoided.

179.   Further, within the two (2) years prior to the Petition Date, the Debtor (i)

transferred cash or other property to the Monroe Lender Defendants on account of the

Prepetition Credit Agreement, and (ii) made certain amendments or modifications to the

Prepetition Agreement that, among other things, provided releases to the Monroe Lender

Defendants, and transferred interests of the Debtor in property (collectively, the "Two Year

Monroe Transfers").

180.   The Two Year Monroe Transfers were transfers made by the Debtor to or for

the benefit of the Monroe Lender Defendants.

181.   The Debtor received less than reasonably equivalent value in exchange for its

transfer of each of the Two Year Monroe Transfers.

182.   When the Debtor transferred the Two Year Monroe Transfers, the Debtor (i)

was insolvent or became insolvent, (ii) was engaged in business or a transaction, or was

about to engage in business or a transaction, for which its remaining property was

unreasonably small capital, and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

183.    The safe harbor provisions of Bankruptcy Code section 546(e) do not apply to the Two Year Monroe Transfers.

184.    The Two Year Monroe Transfers are avoidable under Bankruptcy Code section 544 and applicable state law.

185.    For the reasons set forth above, the Monroe Lender Defendants are liable to the Debtor and its estate for the return of the Two Year Monroe Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtor's estate.

### Thirteenth Claim for Relief

**Recovery of Avoided Fraudulent Transfers Under Bankruptcy Code Section 550 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law (Against All Monroe Lender Defendants)**

186.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 185 as if fully set forth herein.

187.    The One Year Insider Payments, 2012 Monroe Loan Payments, Four Year Monroe Transfers, and Two Year Monroe Transfers are avoidable under Bankruptcy Code section 544 and applicable state law, and, accordingly, pursuant to Bankruptcy Code section 550(a) of the Bankruptcy Code and applicable state law, Plaintiff is entitled to recover from the Monroe Lender Defendants the value of the One Year Insider Payments, 2012 Monroe Loan Payments, Four Year Monroe Transfers, and Two Year Monroe Transfers, plus interest from the transfer dates, and costs and fees, for the benefit of the Debtor's estate.

## Fourteenth Claim for Relief

### Enforcement of Final DIP Order Unwinding the Roll-Up (All Monroe Lender Defendants)

188.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 187 as if fully set forth herein.

189.    Pursuant to the Final DIP Order, the Court approved the Roll-Up, subject to the express right under the Final DIP Order to unwind such Roll-Up to the extent, among other things, any of the obligations owing under the Prepetition Credit Agreement were not secured by the "DIP Liens" (as defined in the Final DIP Order) as of the Petition Date. Final DIP Order, ¶ 6; Hr'g Tr. 9/29/16, p. 41:15–42:11.    Under the Final DIP Order, the Court reserved the right to "fashion whatever remedy it thinks appropriate at the time" in unwinding the Roll-Up.  Hr'g Tr. 9/29/16, p. 42:8–10.

190.    As of the Petition Date, the obligations under the Prepetition Credit Agreement were not secured by liens on the Unencumbered Assets.

191.    Further, for the reasons set forth above, the Monroe Lender Defendants' allowed secured claim under the Prepetition Credit Agreement is subject to claims for fraudulent transfer, recharacterization, and equitable subordination.

192.    For the reasons set forth above, Plaintiff requests an order or judgment against the Monroe Lender Defendants (i) unwinding the Roll-Up such that the obligations under the Prepetition Credit Agreement are not secured by liens on the Unencumbered Assets, and the Roll-Up should be denied such that it provides any relief with respect to claims related to the Prepetition Credit Agreement that are avoided, recharacterized as equity, or equitably subordinated, or (ii) granting such other relief or remedy that the Court thinks appropriate at this time or that justice so requires.

## **Fifteenth Claim for Relief**

### **Tortious Interference (All Monroe Lender Defendants)**

193.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 192 as if fully set forth herein.

194.    The Debtor was and is subject to contracts with certain trade vendors and other customers pursuant to which, among other things, the Debtor received goods or services that the Debtor agreed to make payment for within specific amounts of time set forth in the Debtor's respective agreements.  Further, the Debtor was and is subject to real property leases pursuant to which, among other things, the Debtor agreed to make periodic rent and other payments in exchange for the Debtor's right to use and possess certain properties.

195.    Further, the Debtor's Bylaws have specific procedures and requirements regarding, among other things, (i) the occurrence of regular meetings for the Debtor's board of directors, and (ii) the selection, removal, and compensation for the Debtor's officers.

196.    The Monroe Lender Defendants willfully and intentionally interfered with the Debtor's contracts with trade vendors by overseeing and/or causing the Debtor to order more goods and supplies than the Debtor needed at that time and/or had sufficient funds to pay for in the ordinary course of business.  Further, the Monroe Lender Defendants willfully and intentionally interfered with the Debtor's real property leases by overseeing and/or causing the Debtor to enter into lease renegotiations, during which time the Debtor benefited from rent forbearances or other concessions, which lease renegotiations were later terminated with the consent, approval, and/or at the direction of the Monroe Lender Defendants.

197.    The Monroe Lender Defendants willfully and intentionally interfered with the Debtor's Bylaws by (i) causing the Debtor's board of directors to cease holding regular meetings, and (ii) directly or indirectly, without board of director participation, selecting and/or removing certain of the Debtor's officers and directors and/or setting the compensation amounts for certain of the Debtor's officers.

198.    The Monroe Lender Defendants' interference with the Debtor's contracts, leases, and Bylaws has actually and proximately caused damage to the Debtor and its estate.

199.    The Monroe Lender Defendants have tortuously interfered with the Debtor's business and existing contracts and agreements.

200.    For the reasons set forth above, the Monroe Lender Defendants are liable to the Debtor and its estate for the return of the One Year Insider Payments, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtor's estate.

## Sixteenth Claim for Relief

### Breach of Fiduciary Duty (Against TPP Holdings)

201.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 200 as if fully set forth herein.

202.    As the sole shareholder of the Debtor, TPP Holdings owed the Debtor fiduciary duties of good faith, honest governance, loyalty, and care.

203.    Upon information and belief, TPP Holdings did not hold regular stockholder meetings for the Debtor.

204.    In addition to its ability to influence or direct decisions by the Debtor by yielding 100% of the voting equity of the Debtor through TPP Holdings, TPP Holdings' affiliates, the Monroe Lender Defendants, exerted substantial influence over the Debtor as the Debtor's prepetition secured creditor.  TPP Holdings engaged in a self-serving campaign to benefit only its affiliates, the Monroe Lender Defendants, to the detriment of the Debtor and the Debtor's unsecured creditors.

205.    TPP Holdings, for the benefit of and/or in concert with the Monroe Lender Defendants, continually usurped corporate opportunities of the Debtor.  Zia Uddin, a representative of the Monroe Lender Defendants and TPP Holdings, controlled a sale process for the Debtor and/or its assets in 2015, and received offers for the purchase and sale of the Debtor and/or its assets.  Mr. Uddin and the other members of the Monroe Lender Defendants and TPP Holdings refused to enter into any such purchase agreements for the sole purpose of furthering the interests of the Monroe Lender Defendants and without regard for the best interests of the Debtor.

206.    Zia Uddin also controlled any negotiations with potential strategic partnerships with the Debtor, and made decisions over whether such strategic partnerships, including Wal-Mart, would be pursued, notwithstanding any contrary recommendations by the Debtor's officers.  In doing so, TPP Holdings, through Zia Uddin, usurped corporate opportunities of the Debtor for the sole purpose of furthering the interests of the Monroe Lender Defendants and without regard for the best interests of the Debtor.

207.    In violation of its fiduciary duties, TPP Holdings engaged in inequitable conduct with regard to the Debtor and its creditors by, while the Debtor was insolvent, continuing to purchase Merchandise on credit, open and then close new stores, all while

knowing that the Monroe Lender Defendants might not fund or permit the costs of such goods, interests, or services, and all while planning a potential bankruptcy for the Debtor. Contemporaneously, TPP Holdings negotiated the Stalking Horse Agreement, pursuant to which the Debtor agreed to sell substantially all of the Debtor's assets initially to TPP Holdings, and later to the Monroe Lender Defendants or an affiliate thereof, without paying unsecured creditors any distributions on account of their claims.

208.    TPP Holdings abused its position of trust and control over the Debtor by structuring transactions in a manner solely designed to benefit TPP Holdings' and the Monroe Lender Defendants' exclusive interests.

209.    TPP Holdings is the alter ego of the Monroe Lender Defendants.

210.    The Debtor and its creditors have suffered damages in an amount to be proved at trial as a result of TPP Holdings' breaches of its fiduciary duties.

211.    For the reasons set forth above, Plaintiff is entitled to a judgment against TPP Holdings in the amount of the damages suffered by the Debtor and its creditors, in an amount to be determined at trial.

## Seventeenth Claim for Relief

**Aiding and Abetting Breach of Fiduciary Duty (Against the Monroe Lender Defendants)**

212.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 211 as if fully set forth herein.

213.    TPP Holdings owed and breached fiduciary duties to the Debtor.

214.    The Debtor's officers and directors also owed fiduciary duties to the Debtor, including the duties of care, loyalty, and good faith.

215.   The Debtor's officers and directors breached their fiduciary duties to the Debtor by, among other things (i) failing to act in a manner aimed at advancing the best interests of the Debtor, (ii) failing to make informed business decisions based on material information, (iii) failing to seek advice from employees or advisors not selected by or beholden to the Monroe Lender Defendants, (iv) acting in a manner designed to further the interests of the Monroe Lender Defendants or their relationship with the Monroe Lender Defendants over the interests of the Debtor, (v) failing to act within the Debtor's Bylaws or to ensure that the Debtor was operating in a manner consistent with the Debtor's Bylaws, and (vi) approving the transactions contemplated under the Prepetition Credit Agreement, including, but not limited to, the dividend to Blackstreet Owner, while interested in the transactions and without performing an adequate investigation or analysis of the benefit of such transactions to the Debtor.   Through their misconduct, the Debtor's officers and directors derived personal financial benefits.

216.   Upon information and belief, the conduct of the Debtor's officers and directors were grossly negligent and their actions and conduct cannot be attributed to any rational business purpose.

217.   The Monroe Lender Defendants knew that TPP Holdings and the Debtor's officers and directors were engaged in breaches of fiduciary duty and other misconduct.

218.   The Monroe Lender Defendants knowingly participated in or acquiesced to, benefitted from and aided and abetted the breaches of fiduciary duty engaged in by TPP Holdings and the Debtor's officers and directors.   The Monroe Lender Defendants knowingly participated in TPP Holdings' and the Debtor's officers' and directors' breaches

of fiduciary duty by encouraging and approving the transactions described above which have injured the Debtor and its creditors.

219.    As a result of TPP Holdings' and the Debtor's officers' and directors' breaches of fiduciary duty, which the Monroe Lender Defendants aided and abetted, the Debtor and its creditors have been damaged in an amount to be proved at trial.

220.    For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in the amount of the damages suffered by the Debtor and its creditors, in an amount to be determined at trial.

## Eighteenth Claim for Relief

### Instrumentality/Control Liability (Against the Monroe Lender Defendants)

221.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 220 as if fully set forth herein.

222.    At all times after the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity of the Debtor, the Monroe Lender Defendants controlled the Debtor.  The Monroe Lender Defendants' substantial control over the Debtor is evidenced by, among other things, (i) the Monroe Lender Defendants causing the replacement of the Debtor's board of directors with persons loyal to the Monroe Lender Defendants, (ii) the Monroe Lender Defendants attending and participating in all meetings for the Debtor's board of directors, (iii) the Monroe Lender Defendants causing the replacement of the Debtor's prior CEO, John Johnson, with Ian Gomar, who has admitted his loyalty to the Monroe Lender Defendants, (iv) the Monroe Lender Defendants directly negotiating employment terms for the Debtor's executive officers, (v) the Monroe Lender Defendants deciding which vendors and landlords would be paid, and (vi) causing the Debtor to

continue to order Merchandise on credit and to benefit from rent forbearances while the Monroe Lender Defendants limited the funding available to repay such unsecured debt and while the Monroe Lender Defendants were analyzing a potential chapter 11 bankruptcy filing for the Debtor.

223.    The Monroe Lender Defendants exerted and misused control over the Debtor for their sole benefit.

224.    The Monroe Lender Defendants' actions with respect to the Debtor caused actual and proximate harm to the Debtor and its creditors in an amount to be proven at trial.

225.    For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in the amount of the damages suffered by the Debtor and its creditors, in an amount to be determined at trial.

## Nineteenth Claim for Relief

### Principal/Agent Liability (Against the Monroe Lender Defendants)

226.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 225 as if fully set forth herein.

227.    Through agreement and/or the actions of the Debtor and the Monroe Lender Defendants, the Debtor and the Monroe Lender Defendants have consented to the Monroe Lender Defendants' control over the Debtor and to the Debtor acting as agent for the Monroe Lender Defendants.

228.    At all times after the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity of the Debtor, the Monroe Lender Defendants controlled the Debtor.  The Monroe Lender Defendants' substantial control over the Debtor is evidenced

by, among other things, (i) the Monroe Lender Defendants causing the replacement of the Debtor's board of directors with persons loyal to the Monroe Lender Defendants, (ii) the Monroe Lender Defendants attending and participating in all meetings for the Debtor's board of directors, (iii) the Monroe Lender Defendants causing the replacement of the Debtor's prior CEO, John Johnson, with Ian Gomar, who has admitted his loyalty to the Monroe Lender Defendants, (iv) the Monroe Lender Defendants directly negotiating employment terms for the Debtor's executive officers, (v) the Monroe Lender Defendants deciding which vendors and landlords would be paid, and (vi) causing the Debtor to continue to order Merchandise on credit and to benefit from rent forbearances while the Monroe Lender Defendants limited the funding available to repay such unsecured debt and while the Monroe Lender Defendants were analyzing a potential chapter 11 bankruptcy filing for the Debtor.

229.   The Debtor's and the Monroe Lender Defendants' actions have created a principal-agent relationship, and the Debtor has entered into contracts and agreements for the use and purchase of goods, services and property under the control of and at the direction of the Monroe Lender Defendants.

230.   The Monroe Lender Defendants, as principal, are liable for the obligations of the Debtor entered into within the normal course of the Debtor's business.

231.   For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in the amount of the damages suffered by the Debtor and its creditors, in an amount to be determined at trial, but in no event less than the amount of obligations the Debtor entered into within the normal course of the Debtor's business as agent for the Monroe Lender Defendants.

## Twentieth Claim for Relief

### Reimbursement and Indemnification (Against the Monroe Lender Defendants)

232.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 231 as if fully set forth herein.

233.    Through agreement and/or the actions of the Debtor and the Monroe Lender Defendants, the Debtor and the Monroe Lender Defendants have consented to the Monroe Lender Defendants' control over the Debtor and to the Debtor acting as agent for the Monroe Lender Defendants.

234.    At all times after the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity of the Debtor, the Monroe Lender Defendants controlled the Debtor.  The Monroe Lender Defendants' substantial control over the Debtor is evidenced by, among other things, (i) the Monroe Lender Defendants causing the replacement of the Debtor's board of directors with persons loyal to the Monroe Lender Defendants, (ii) the Monroe Lender Defendants attending and participating in all meetings for the Debtor's board of directors, (iii) the Monroe Lender Defendants causing the replacement of the Debtor's prior CEO, John Johnson, with Ian Gomar, who has admitted his loyalty to the Monroe Lender Defendants, (iv) the Monroe Lender Defendants directly negotiating employment terms for the Debtor's executive officers, (v) the Monroe Lender Defendants deciding which vendors and landlords would be paid, and (vi) causing the Debtor to continue to order Merchandise on credit and to benefit from rent forbearances while the Monroe Lender Defendants limited the funding available to repay such unsecured debt and while the Monroe Lender Defendants were analyzing a potential chapter 11 bankruptcy filing for the Debtor.

235.    The Debtor's and the Monroe Lender Defendants' actions have created a principal-agent relationship, and the Debtor has entered into contracts and agreements for the use and purchase of goods, services and property under the control of and at the direction of the Monroe Lender Defendants.  The Monroe Lender Defendants, as principal, are liable for the obligations of the Debtor entered into within the normal course of the Debtor's business.

236.    Acting as agent for the Monroe Lender Defendants, the Debtor has, with its property and assets, paid or satisfied certain of those obligations for which the Monroe Lender Defendants are liable.  Other such obligations remain outstanding and have been asserted against the Debtor and the estate in the Debtor's chapter 11 case.

237.    Further, since Ian Gomar's retention by the Debtor and/or the Monroe Lender Defendants in connection with the Debtor's business, Mr. Gomar has been the agent and a representative of the Monroe Lender Defendants.  The Monroe Lender Defendants, directly or through its agents, has incurred obligations, through express or implied contract or through tortious conduct, owing to the Debtor and the Debtor's vendors, landlords, and other creditors.

238.    The Debtor is entitled to indemnity and reimbursement from the Monroe Lender Defendants, as principal for the Debtor, for the above-referenced obligations that have been asserted against the Debtor or that have been paid by the Debtor.

239.    For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in the amount of the damages suffered by the Debtor and its creditors, in an amount to be determined at trial, but in no event less than the amount of

obligations the Debtor entered into, and in certain circumstances paid, within the normal

course of the Debtor's business as agent for the Monroe Lender Defendants.

### Twenty-First Claim for Relief

**Declaratory Relief for Plaintiff – Alter Ego Status of the Debtor, the Monroe Lender
Defendants, and TPP Holdings (Against the Monroe Lender Defendants and TPP
Holdings)**

240.   Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 239 as if fully set forth herein.

241.   At all times after the Monroe Lender Defendants, through TPP Holdings,

acquired 100% of the equity of the Debtor, the Monroe Lender Defendants controlled the

Debtor.  The Monroe Lender Defendants' substantial control over the Debtor is evidenced

by, among other things, (i) the Monroe Lender Defendants causing the replacement of the

Debtor's board of directors with persons loyal to the Monroe Lender Defendants, (ii) the

Monroe Lender Defendants attending and participating in all meetings for the Debtor's

board of directors, (iii) the Monroe Lender Defendants causing the replacement of the

Debtor's prior CEO, John Johnson, with Ian Gomar, who has admitted his loyalty to the

Monroe Lender Defendants, (iv) the Monroe Lender Defendants directly negotiating

employment terms for the Debtor's executive officers, (v) the Monroe Lender Defendants

deciding which vendors and landlords would be paid, and (vi) causing the Debtor to

continue to order Merchandise on credit and to benefit from rent forbearances while the

Monroe Lender Defendants limited the funding available to repay such unsecured debt and

while the Monroe Lender Defendants were analyzing a potential chapter 11 bankruptcy

filing for the Debtor.

242.    While the Debtor was under the control of the Monroe Lender Defendants and TPP Holdings, the Debtor and its officers and directors failed to observe corporate formalities, as admitted by the Debtor through its counsel and evidenced in part by the fact that (i) the Debtor's board of directors did not hold regular meetings, (ii) Ian Gomar, the Debtor's CEO and director selected by the Monroe Lender Defendants, never reviewed the Debtor's Bylaws, and (iii) the Monroe Lender Defendants directly negotiated employment terms for the Debtor's executive officers, when this was the sole duty and obligation of the Debtor's board of directors.

243.    The Debtor's CEO, Ian Gomar, although purporting to act on behalf of the Debtor, suggested to a potential vendor related to "Fotobar" that he was working for the Monroe Lender Defendants and that the Monroe Lender Defendants would be involved in any potential agreement regarding "Fotobar."

244.    There exists such unity between the Debtor, on the one hand, and the Monroe Lender Defendants and TPP Holdings, on the other hand, that the separateness of the Debtor has ceased, and holding only the Debtor liable for its debts would result in injustice to the Debtor and its creditors.

245.    The Debtor was used by the Monroe Lender Defendants and TPP Holdings as their alter ego for the purpose of perpetrating an actual fraud for the Monroe Lender Defendants' and TPP Holdings' direct personal benefit, and/or a similar injustice.

246.    After the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity in the Debtor, the Monroe Lender Defendants caused the Debtor to use its stated relationship with the Monroe Lender Defendants to assure trade creditors and landlords that the Debtor would have sufficient funds to satisfy outstanding payables,

although the Monroe Lender Defendants and TPP Holdings were planning or had planned the eventual bankruptcy filing of the Debtor, and knew that such trade creditors and landlords would not be paid for their goods or services.

247.    The Debtor, on the one hand, and the Monroe Lender Defendants and TPP Holdings, on the other hand, are alter egos, and the Monroe Lender Defendants and TPP Holdings are jointly and severally liable for claims and indebtedness asserted against the Debtor.

248.    For all the reasons set forth above, Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Monroe Lender Defendants and TPP Holdings are the alter ego of the Debtor and are jointly and severally liable for claims and indebtedness asserted against the Debtor.    Accordingly, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in an amount to be determined at trial, but in no event less than the amount of the total claims and indebtedness asserted against the Debtor.

## Twenty-Second Claim for Relief

**Declaratory Relief for Plaintiff – Alter Ego Status of the Monroe Lender Defendants and TPP Holdings (Against the Monroe Lender Defendants and TPP Holdings)**

249.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 248 as if fully set forth herein.

250.    On information and belief, at all times after the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity of the Debtor, the Monroe Lender Defendants controlled TPP Holdings in all respects.

251.    On information and belief, the Monroe Lender Defendants and TPP Holdings failed to observe corporate formalities.

252.    There exists such unity between the Monroe Lender Defendants and TPP Holdings that the separateness of TPP Holdings has ceased, and holding only TPP Holdings liable for its debts would result in injustice to TPP Holdings and its creditors.

253.    TPP Holdings was used by the Monroe Lender Defendants as their alter ego for the purpose of perpetrating an actual fraud for the Monroe Lender Defendants' direct personal benefit, and/or a similar injustice.

254.    After the Monroe Lender Defendants, through TPP Holdings, acquired 100% of the equity in the Debtor, the Monroe Lender Defendants caused the Debtor to use its stated relationship with the Monroe Lender Defendants, whether as owner through TPP Holdings or as lenders, to assure trade creditors and landlords that the Debtor would have sufficient funds to satisfy outstanding payables, although the Monroe Lender Defendants and TPP Holdings were planning or had planned the eventual bankruptcy filing of the Debtor, and knew that such trade creditors and landlords would not be paid for their goods or services.

255.    The Monroe Lender Defendants and TPP Holdings are alter egos, and the Monroe Lender Defendants are jointly and severally liable for claims and indebtedness asserted against TPP Holdings.

256.    For all the reasons set forth above, Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Monroe Lender Defendants are the alter ego of TPP Holdings and are jointly and severally liable for claims and indebtedness asserted against the TPP Holdings.  Accordingly, Plaintiff is entitled to a judgment against the Monroe Lender Defendants in an amount to be determined at trial, but in no event less than the amount of the total claims and indebtedness asserted against TPP Holdings.

## Twenty-Third Claim for Relief

### Disallowance of Claims Under Bankruptcy Code Section 502(d) and Avoidance of Liens Securing Such Claims Under Section 506(d) (Against the Monroe Lender Defendants)

257.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 256 as if fully set forth herein.

258.    Claims held by the Monroe Lender Defendants are subject to disallowance under Bankruptcy Code section 502(d) unless and until the Monroe Lender Defendants have turned over to the Debtor all property transferred, or paid the Debtor the value of such property, for which the Debtor is liable under sections 542, 550, or 553 of the Bankruptcy Code.

259.    In the event that (a) the property is recoverable from the Monroe Lender Defendants under sections 542, 550, or 553 of the Bankruptcy Code, or (b) any of the transfers made to the Monroe Lender Defendants are avoidable under section 544, 547, or 548 of the Bankruptcy Code, then all of the claims of the Monroe Lender Defendants against the Debtor, to the extent not already waived, should be disallowed unless and until the Monroe Lender Defendants have turned over to the Debtor all property transferred, or paid the Debtor the value of such property, for which they are liable under sections 542, 550, or 553 of the Bankruptcy Code.

260.    Based on the foregoing, to the extent a lien secures a claim that is disallowed, such liens are void under Bankruptcy Code section 506(d).

261.    For the reasons set forth above, unless and until the Monroe Lender Defendants have turned over to the Debtor all property transferred, or paid the Debtor the value of such property, for which they are liable under sections 542, 550, or 553 of the Bankruptcy Code, any claim asserted by the Monroe Lender Defendants should be

disallowed under Bankruptcy Code section 502(d), and any lien asserted by the Monroe

Lender defendants should be determined to be void under Bankruptcy Code section 506(d).

### Twenty-Fourth Claim for Relief

**Disallowance of Claims Under Bankruptcy Code Section 502(b) (Against the Monroe Lender Defendants)**

262.    Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 261 as if fully set forth herein.

263.    The Monroe Lender Defendants assert that, as of the Petition Date, the

amount owing under the Prepetition Credit Agreement totaled not less than $41,271,837.90,

plus interest accrued and accruing at the default rate, costs, expenses, fees, and other

charges and obligations (collectively, the "Asserted Prepetition Debt").

264.    On information and belief, the Asserted Prepetition Debt is inconsistent with

the Debtor's books and records, and is therefore unenforceable against the Debtor.

265.    For the reasons set forth above, under Bankruptcy Code section 502(b), the

Monroe Lender Defendants' claim against the Debtor under the Prepetition Credit

Agreement should be reduced and disallowed by an amount to be determined at trial.

### Twenty-Fifth Claim for Relief

**Breach of Contract (Against the Monroe Lender Defendants and Purchaser)**

266.    Plaintiff repeats and realleges each and every allegation in paragraphs 1

through 265 as if fully set forth herein.

267.    The Stalking Horse Agreement is a binding, valid, and enforceable contract.

268.    The Debtor has complied with any and all provisions under the Stalking

Horse Agreement regarding the sale and transfer of the Purchased Assets to Purchaser.

269.    Under the Stalking Horse Agreement, after the closing of the Asset Sale, Purchaser is solely and directly obligated to pay all (i) "Operational Expenses of Seller that are directly related to the operation of such Undesignated Stores," which includes all lease obligations due for the Debtor's remaining mall-based stores, Stalking Horse Agreement, § 1.7(c)(i); Sale Order, ¶ 50; and (ii) "administrative and priority claims arising out of the conduct of the Business that accrued between the Petition Date and the Closing Date and that remain unpaid as of the Closing Date," Stalking Horse Agreement, § 1.3(d); Sale Order, ¶ 9.

270.    On information and belief, the Monroe Lender Defendants and Purchaser have attempted to satisfy the obligations described in Paragraph 272 through advances under the DIP Credit Agreement.

271.    The Monroe Lender Defendants and Purchaser have breached their contractual obligations under the Stalking Horse Agreement to pay the obligations described in Paragraph 272.

272.    As a direct and proximate result of their breaches of contract, the Debtor has been damaged in the amount of the increased claim incurred under the DIP Credit Agreement to satisfy the obligations described in Paragraph 272, and the amount owing under the DIP Credit Agreement should be reduced by such amount.

273.    For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants reducing the amount owed under the DIP Credit Agreement in an amount to be determined at trial.

### Twenty-Sixth Claim for Relief

**In the alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing
(Against the Monroe Lender Defendants and Purchaser)**

274.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 273 as if fully set forth herein.

275.     The Stalking Horse Agreement is a binding, valid, and enforceable contract.

276.     Illinois law recognizes an implied covenant of good faith and fair dealing in all contracts.  Pursuant to this principle, the Monroe Lender Defendants and Purchaser owe Plaintiff a duty of good faith and fair dealing under the Stalking Horse Agreement.

277.     The Debtor has complied with any and all provisions under the Stalking Horse Agreement regarding the sale and transfer of the Purchased Assets to Purchaser.

278.     Under the Stalking Horse Agreement, after the closing of the Asset Sale, Purchaser is solely and directly obligated to pay all (i) "Operational Expenses of Seller that are directly related to the operation of such Undesignated Stores," which includes all lease obligations due for the Debtor's remaining mall-based stores, Stalking Horse Agreement, § 1.7(c)(i); Sale Order, ¶ 50; and (ii) "administrative and priority claims arising out of the conduct of the Business that accrued between the Petition Date and the Closing Date and that remain unpaid as of the Closing Date," Stalking Horse Agreement, § 1.3(d), Sale Order, ¶ 9.

279.     On information and belief, the Monroe Lender Defendants and Purchaser have attempted to satisfy the obligations described in Paragraph 281 through advances under the DIP Credit Agreement.

280.   The foregoing conduct of the Monroe Lender Defendants and Purchaser was performed in bad faith, for the improper purpose of inflating the amount of any right to credit bid for the Purchased Assets.

281.   As a result of the foregoing, the Monroe Lender Defendants and Purchaser breached their implied covenant of good faith and fair dealing with the Debtor, and the Debtor has been damaged in the amount of the increased claim incurred under the DIP Credit Agreement to satisfy the obligations described in Paragraph 281, and the amount owing under the DIP Credit Agreement should be reduced by such amount.

282.   For the reasons set forth above, Plaintiff is entitled to a judgment against the Monroe Lender Defendants reducing the amount owed under the DIP Credit Agreement in an amount to be determined at trial.

## Twenty-Seventh Claim for Relief

### Enforcement of Sale Order (Against the Monroe Lender Defendants and Purchaser)

283.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 282 as if fully set forth herein.

284.   Upon the closing of the Asset Sale, all claims of the Monroe Lender Defendants, Purchaser, or any of their respective successors and assigns against the Debtor or the Debtor's estate arising out of the Prepetition Credit Agreement or DIP Agreement in excess of the Credit Bid were novated and extinguished.  Sale Order, ¶ 9.  As a result of this provision, the Monroe Lender Defendants, Purchaser and their respective successors and assigns have no further rights in the assets of the Debtor effective as of the closing of the Asset Sale.

285.   Upon information and belief, the Debtor has paid or intends to pay to the Monroe Lender Defendants or Purchaser certain cash amounts that were held in reserve after the closing of the Asset Sale.

286.   Any right, claim, lien, or interest of the Monroe Lender Defendants or Purchaser to any assets remaining in the Debtor's estate after the closing of the Asset Sale was released under paragraph 9 of the Sale Order.  As a result, all such cash should remain in the Debtor's estate free and clear of the Monroe Lender Defendants' or Purchaser's rights, claims, liens, or interests, or if paid, should be paid by to the Debtor and its estate.

287.   For the reasons set forth above, Plaintiff requests an order or judgment against the Monroe Lender Defendants and the Purchaser (i) providing that all cash and other assets in the Debtor's estate after the closing of the Asset Sale shall remain in the Debtor's estate free and clear of the Monroe Lender Defendants' and the Purchaser's rights, claims, liens, or interests, (ii) if any cash remaining with the Debtor after the closing of the Asset Sale has been paid to the Monroe Lender Defendants, the Purchaser, or any assign thereof, such cash should be returned to the Debtor's estate, or (iii) granting such other relief or remedy that the Court thinks appropriate at this time or that justice so requires.

<b><u>Twenty-Eighth Claim for Relief</u></b>

<b>Declaratory Relief for Plaintiff – Monroe General Partner is Liable for All Damages and Claims Asserted Against Monroe CP (Against Monroe General Partner)</b>

288.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 287 as if fully set forth herein.

289.   Monroe General Partner is the general partner of Monroe CP.

290.   As a matter of nonbankruptcy law, Monroe General Partner is liable for all damages or other awards determined to be owing by Monroe CP.

291.    For all the reasons set forth above, Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Monroe General Partner is liable for all damages or other awards determined to be owing by Monroe CP.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order

a)      declaring that, under the Sale Order, Purchaser, Monroe CP, Monroe CC, and Monroe General Partner must pay cash to the Debtor's estate in an amount equal to the difference between $12,000,000 and the allowed amount of the Monroe Lender Defendants' secured claim, which amount is to be determined at trial;

b)      subordinating the Monroe Lender Defendants' claims under the Prepetition Credit Agreement, in total, against the Debtor to all other claims;

c)      recharacterizing the Monroe Lender Defendants' claims arising out of the Post-Equity Advances against the Debtor as equity;

d)      avoiding the 2015 DACA, any lien of the Monroe Lender Defendants against the Unencumbered Assets, the One Year Insider Payments, the 2012 Monroe Loan Payments, the Two Year Monroe Transfers, the Four Year Monroe Transfers, obligations incurred under the Prepetition Credit Agreement with respect to the 2012 Monroe Loan, and the 2012 Monroe Liens;

e)      entering judgment for Plaintiff to recover, pursuant to Bankruptcy Code section 550, the value of the preferential and fraudulent transfers that the Debtor made, in an amount to be proven at trial, plus pre-judgment interest;

f)      entering judgment in favor of Plaintiff unwinding the Roll-Up;

g)      entering judgment in favor of Plaintiff and the Debtor for damages, including but not limited to punitive damages, due to TPP Holdings' breach of fiduciary duties in an amount to be determined at trial;

h)      entering judgment in favor of Plaintiff and the Debtor for damages, including but not limited to punitive damages, due to the Monroe Lender Defendants' aiding and abetting breaches of fiduciary duties in an amount to be determined at trial;

i)      entering judgment in favor of Plaintiff and the Debtor for damages, including but not limited to punitive damages, due to the Monroe Lender Defendants' control over the Debtor and damages caused thereby in an amount to be determined at trial;

j)      entering judgment in favor of Plaintiff and the Debtor for reimbursement and indemnification in an amount to be determined at trial;

k)      declaring that the Monroe Lender Defendants and TPP Holdings are the alter ego of the Debtor and liable for claims and indebtedness owed by the Debtor in an amount to be determined at trial;

l)      declaring that the Monroe Lender Defendants are the alter ego of TPP Holdings and liable for claims and indebtedness owed by TPP Holdings in an amount to be determined at trial;

m)      reducing the amount owing under the DIP Credit Agreement as of the closing of the Asset Sale by an amount equal to the post-closing payments by the Debtor of obligations for which the Monroe Lender Defendants or Purchaser are liable under the Stalking Horse Agreement and Sale Order;

n)      enforcing the Sale Order and declaring that all assets in the Debtor's estate after the closing of the Asset Sale shall remain in the Debtor's estate free and clear of all of

the Monroe Lender Defendants' and the Purchaser's rights, claims, liens, or interests, or entering judgment in favor of Plaintiff and Debtor for any such assets paid or transferred to the Monroe Lender Defendants, the Purchaser, or any assignee thereof;

o)   preserving all transfers and liens avoided for the benefit of the Debtor's estate under Bankruptcy Code section 551;

p)   awarding Plaintiff all reasonable attorneys' fees, costs and disbursements in this action;

q)   disallowing the claims and avoiding the liens of the Monroe Lender Defendants against the Debtor unless and until the Monroe Lender Defendants have turned over to the Debtor the value of such transferred property for which the Monroe Lender Defendants are liable under sections 542, 550, and 550 of the Bankruptcy Code;

r)   disallowing the Monroe Lender Defendants' claim under the Prepetition Credit Agreement in an amount to be determined at trial; and

s)   granting such other or further relief as is just, proper and equitable.

Dated: December 9, 2016

Respectfully submitted,

GRUBER ELROD
JOHANSEN HAIL SHANK, LLP

___*/s/ David W. Elrod*_____
David W. Elrod
Samuel M. Stricklin
Tricia R. DeLeon
J. Machir Stull
Hayley Ellison

GIBSON, DUNN & CRUTCHER LLP
Samuel A. Newman
Michael S. Neumeister
Olivia Adendorff

EMMERT & PARVIN, LLP
D. Wade Emmert

***Co-Counsel for Official Committee of
Unsecured Creditors***

**EXHIBIT A**

| Date | Amount |
|------|--------|
| 9/24/15 | $4,399.90 |
| 10/13/15 | $214,228.96 |
| 10/30/15 | $230,771.43 |
| 11/30/15 | $250,656.31 |
| 12/31/15 | $251,188.49 |
| 1/28/16 | $6,305.51 |
| 2/12/16 | $9,125.50 |
| 3/1/16 | $896.35 |
| 3/7/16 | $4,545.00 |
| 3/30/16 | $12,527.50 |
| 4/28/16 | $24,891.00 |
| 5/13/16 | $1,600.00 |
| 5/27/16 | $1,000.29 |
| 5/31/16 | $10,183.50 |
| 6/30/16 | $14,641.40 |
| 7/6/16 | $18,644.40 |
| 7/18/16 | $4,646.16 |
| 7/29/16 | $16,734.35 |
| 8/3/16 | $3,023.20 |
| 8/31/16 | $22,085.57 |
| 8/30/16 | $861.00 |
| **Total** | **$1,102,955.82** |